Argued and submitted March 18, affirmed May 29, petition for review denied December 24, 2014 (356 Or 638)

In the Matter of I. N.,
a Child.

**DEPARTMENT OF HUMAN SERVICES,**
*Petitioner-Respondent,*

*v.*

**G. N.,**
*Appellant.*

Douglas County Circuit Court
1100253;
Petition Number 11JU193;
A155396

328 P3d 728

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Cecil A. Reniche-Smith, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

TOOKEY, J.

### TOOKEY, J.

Father appeals from a judgment of the juvenile court determining that the permanency plan for father's 10-year-old daughter, I, should be changed from reunification to "another planned permanent living arrangement" (APPLA), specifically, long-term foster care.[1] Father challenges the change to APPLA, asserting that the juvenile court erred in concluding that efforts by the Department of Human Services (DHS) toward reunification were reasonable and that, despite those efforts, father's progress toward reunification was insufficient.

Father does not ask us to exercise our discretion to review the record *de novo*, and we conclude that this is not an exceptional case that justifies *de novo* review. *See* ORAP 5.40(8)(c), (d). Accordingly, in reviewing the juvenile court's judgment, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the [juvenile] court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We conclude, based on this record, that there is legally sufficient evidence to support the juvenile court's determination that DHS's efforts were reasonable and that father has not made sufficient progress to allow the child to safely return home. ORS 419B.476(2)(a). We therefore affirm the juvenile court's determination that the plan for the child should be changed to APPLA.

The child lived with her mother until 2009, when her mother died and she came into father's custody. In March 2010, father and stepmother married, and father and the child moved in with stepmother and her four children. There was tension between father and the stepchildren.[2]

---

[1] We affirmed without opinion father's appeal of the juvenile court judgment assuming jurisdiction over I. *Dept. of Human Services v. G. N.*, 249 Or App 179, 276 P3d 1126 (2012).

[2] There are five children in the family—I, and four stepsiblings, Kl, Ke, Ka, and E. Kl, age 19 at the time of the hearing, is no longer subject to the juvenile court's jurisdiction. The permanency plan for two of the stepsiblings, Ke and Ka, has previously been changed to APPLA. This most recent permanency hearing concerned I and E. However, this appeal involves only I. Throughout this opinion,

Father has a history of alcohol abuse and domestic violence when intoxicated. DHS first became involved with the family after an incident of domestic violence in May 2010, when father hurt the child, the child's stepmother, and two of the child's stepsiblings. As a result of that conduct, father was convicted of felony and misdemeanor assault and was ordered to complete a 54-week domestic violence treatment program as a condition of probation. Father was within one week of completion of the program when he was suspended from it in June 2011, after committing another act of domestic violence.

DHS took the children into protective custody in July 2011, and the juvenile court took jurisdiction over the child in September 2011.[3] The child and three of the stepsiblings were placed into foster care with stepmother's mother. The child did not want to see father, and his visits with her did not begin until April 2012. In June 2012, after three months of individual counseling, father began the domestic violence treatment program again. Also in 2012, father and stepmother engaged in and successfully completed in-home parent training. At the completion of parent training in August 2012, the parent educator reported that parents showed "marked improvement" with empathy, and recommended reunification, conditioned on the parents' participation in mental health services to address their own childhood traumas. The parent educator also stated that "[f]amily counseling will be vital if this reunification is to be successful[.]" In a permanency order of September 2012, the juvenile court ordered that, by March 2013, father participate in and make progress in "intensive family counseling."

All of the family members were participating in various forms of counseling. By December 2012, Douglas County had begun the process of implementing family counseling through counseling sessions with the parents and the children separately, but meetings with the parents and the

---

when we refer to "the child," we mean I. When we refer to "the children," we mean I and the stepsiblings.

[3] The juvenile court took jurisdiction over the child pursuant to ORS 419B.100(1)(c) (condition or circumstances endangering the child's welfare) and 419B.100(1)(e)(D) (parents' failure to provide the care, guidance, and protection necessary for the child's physical, mental, or emotional well-being).

children together did not begin immediately. The child had a family counseling session with a therapist, Sprague, and parents in April 2013, which Sprague reported went well. Sprague and parents also had family counseling sessions with each of the other children separately, but after a session with parents and Ke, in which father gave a dismissive response to Ke's request for an apology, Sprague discontinued family therapy, out of concern that it might be doing more harm than good.[4]

In April 2013, father had a medication evaluation and received a prescription for symptoms of ADHD, to treat impulsivity and help him focus. Father took the medication for one month but could not afford to continue it.

At the time of the permanency hearing on August 30, 2013, the permanency plan in effect for the child was reunification. The state took the position that the child could not yet be safely returned home and sought to change the permanency plan to APPLA.

When, at the time of a permanency hearing, the case plan is to reunify the family, ORS 419B.476(2)(a) provides that the juvenile court must

> "determine whether the Department of Human Services has made *reasonable efforts* * * * to make it possible for the ward to safely return home and whether the parent has made *sufficient progress* to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

(Emphasis added.) Thus, before the juvenile court may change a child's permanency plan to something other than reunification, the state must the show that DHS's reunification efforts were reasonable and that, despite those efforts, the parent's progress was insufficient to allow the child to safely return home. *Dept. of Human Services v. A. D.*, 255 Or App 567, 574, 300 P3d 185 (2013); *Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012).

---

[4] Sprague testified that father told Ke, "You know, you've been hurt, I've been hurt, we've all been victims. We all just need to move on now."

Among the permanency plans that a court may order, ORS 419B.476(5)(b)(D) authorizes the court to place the ward in "another planned permanent living arrangement" (APPLA). When the court determines that the permanency plan for a child is APPLA, in addition to the findings required by ORS 419B.476(2)(a), ORS 419B.476(5)(f) requires that the court's order must include

> "the court's determination of a compelling reason, that must be documented by the department, why it would not be in the best interests of the ward to be returned home, placed for adoption, placed with a legal guardian or placed with a fit and willing relative."

An additional consideration was present in this case: At the time of the permanency hearing, the child had been a ward of the court for 26 months. Ordinarily, that circumstance would require DHS to file a petition for termination of parental rights. ORS 419B.498.[5] DHS asserted, however, that there were compelling reasons why the filing of a petition for termination would not be in the child's best interests. ORS 419B.498(2)(b)(B). DHS believed that the current foster placement was a good one and that, although the child

---

[5] ORS 419B.498 provides, in part:

"(1) Except as provided in subsection (2) of this section, the Department of Human Services shall simultaneously file a petition to terminate the parental rights of a child or ward's parents and identify, recruit, process and approve a qualified family for adoption if the child or ward is in the custody of the department and:

"(a) The child or ward has been in substitute care under the responsibility of the department for 15 months of the most recent 22 months;

"* * * * *

"(2) The department shall file a petition to terminate the parental rights of a parent in the circumstances described in subsection (1) of this section unless:

"(a) The child or ward is being cared for by a relative and that placement is intended to be permanent;

"(b) There is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward. Such compelling reasons include, but are not limited to:

"(A) The parent is successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time as provided in ORS 419B.476(5)(c);

"(B) Another permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships[.]"

could not be returned home immediately, it might be possible for her to return home in the future. For those reasons, DHS recommended that the juvenile court not move to termination, but because DHS believed that the child required a more permanent situation, DHS recommended a change in the permanency plan from reunification to APPLA.

At the permanency hearing, the court took testimony from Slater, a DHS caseworker, who presented a summary of the services that had been provided to the family and explained why DHS did not recommend that the child return home. Slater had concerns that, despite long-term therapy, father did not appreciate the impact of his behavior toward the children, and she had doubts about whether he would be able to change his behaviors or have empathy for the children. Slater's report refers to an assessment by father's therapist that father "doesn't seem to fully understand the ongoing need for children to process emotions associated with domestic violence for some time afterwards," and that "he slips back into the victim role very easily."

The children had reported that during visits, stepmother is often on the computer or distracted by other activities, and that the children are left to play on their own. Slater expressed concerns about whether stepmother could make the children a priority and could intervene and protect the child if father became abusive. Slater explained that, although there had been no recent reports of domestic violence between the parents, and no indications that father poses a risk of physical harm to the child, the child does not trust father and does not feel safe being returned to his care. Slater testified that she would like to see if father's attention deficit/hyperactivity disorder (ADHD) and impulsivity could be controlled with consistent use of medication. Slater testified that DHS would continue to work with the parents toward the goal of reunification. But, ultimately, Slater was of the view that it would not be emotionally safe for the child to return to father at this time.

The state called the child's therapist, Sprague, as a witness. Sprague testified that the child, who has been diagnosed with post-traumatic stress disorder (PTSD), has not yet been able to work through the trauma that she has

experienced in her life. She testified that the child reported that visits with father do not go well, that father uses the visits to intimidate her, and that he has told her that if the family is not reunited, it would be the children's fault and that he and stepmother would be homeless. The child reported to Sprague that, based on a generalized fear for her safety, she does not want to return to father and would run away if required to do so.

Sprague described the short-lived family therapy sessions. She testified that she had had family therapy sessions with the parents and each of the children, but discontinued them after a session between the parents and Ke, in which father expressed no empathy for and invalidated Ke's feelings about the abuse. Sprague expressed the opinion that father is not yet able to take responsibility for his abusive behaviors and is unable to tune in to the children's needs. Sprague asked father to write Ke a letter of apology but he did not do so. She said that she discontinued family therapy because she thought it would be harmful to the children. Father's own therapist concurred in the recommendation that father not participate in family therapy. Sprague testified, however, that the plan is to continue therapy with the children separately and gradually bring the parents back in.

The children's court-appointed special advocate (CASA) testified that parents clearly love the children. The CASA gave the parents credit for having well-adjusted children, but testified that "it is a safety issue at this time and it's most of all trust. So basically that's it and I just agree that they should stay in their current foster placement right now."

Father, for his part, did not assert that the child could safely return home immediately or that the wardship should be terminated. He contended, however, that the child's fear about future abuse could be ameliorated through additional family counseling and greater visitation. Father pointed out that family counseling had been required by the juvenile court in September 2012 and has been among the recommendations of the many experts who have worked with the family. Father blamed DHS for failing to continue

family therapy and for failing to include funding for father's ADHD medication in his service agreement.

The juvenile court's judgment includes a determination that DHS's efforts have been reasonable and that father's progress toward ameliorating the adjudicated bases for jurisdiction are insufficient. As previously noted, because of the duration of the wardship, a determination that the child could not be returned home would ordinarily require a change to a permanency plan of adoption and require the filing of a termination petition. ORS 419B.498(2). However, in this case, the court agreed with DHS that there are compelling reasons not to move to adoption and termination. Specifically, the court found that the child's age, her attachment to her stepsiblings and parents, and the chance that father could eventually make sufficient progress for the child to safely return home militated against a plan of adoption. The court therefore changed the permanency plan for the child from reunification to APPLA. Father appeals, contending that the court erred in its determinations of "reasonable efforts" and "sufficient progress."

The juvenile court's determinations whether DHS's efforts were reasonable and the parent's progress was sufficient are legal conclusions that we review for errors of law. *Dept. of Human Services v. J. F. D.*, 255 Or App 742, 744, 298 P3d 653 (2013) (stating standard of review of "reasonable efforts" determination); *A. D.*, 255 Or App at 579 (applying standard of review to "sufficient progress" determination). We are bound by the court's findings of historical fact if there is any evidence in the record to support them. *Id.* As we have stated, "When the juvenile court does not make findings on disputed issues of fact, but the evidence supports more than one factual conclusion, we presume that the court decided those issues in a manner consistent with its ultimate conclusion." *Dept. of Human Services v. J. R. L.*, 256 Or App 437, 439, 300 P3d 291 (2013). As previously noted, we view the evidence, including any permissible inferences, in the light most favorable to the juvenile court's disposition, and assess whether, when so viewed, the record was legally sufficient to permit the juvenile court's disposition. *N. P.*, 257 Or App at 639.

Father asserts on appeal that the record is insufficient to support the juvenile court's determination that DHS made reasonable efforts to achieve reunification. Specifically, father contends that DHS: (1) unreasonably delayed offering to pay for father's ADHD medication until the children had been in state custody for 22 months; (2) unreasonably did not start family counseling with the child until 22 months into the case; (3) unreasonably discontinued family counseling between father and the child after only one session, based on one negative session between father and one of the stepchildren; and (4) unreasonably limited father's visits with the child to only one hour per week, thereby failing to facilitate the child's successful return to the family. The state responds that the record, viewed in the light most favorable to the juvenile court's disposition, *N. P.*, 257 Or App at 639, supports the juvenile court's determination that DHS made reasonable efforts.

The juvenile court did not make specific findings as to DHS's efforts with respect to each of the services mentioned by father. Thus, we assume that the juvenile court made findings consistent with its overall conclusion that DHS made reasonable efforts. *J. R. L.*, 256 Or App at 439 (when court does not make explicit findings, we assume that the court made findings consistent with its legal conclusion).

The types of efforts required by DHS depend on the particular circumstances of each case. *State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 506, 130 P3d 801 (2006). In a permanency judgment of September 2012, the court continued the permanency plan of reunification and ordered father to participate in intensive family counseling. In a report of December 2012 prepared for a review hearing on December 11, 2012, *see* ORS 419B.449 ("[T]he court may hold a hearing to review the child or ward's condition and circumstances and to determine if the court should continue jurisdiction and wardship or order modifications in the care, placement and supervision of the child or ward."), a DHS caseworker reported that the family was "participating" in family counseling and that it was going well. In fact, although counseling was occurring with each of the children and parents separately, Sprague did not begin to counsel

the parents and the child together until April 2013. And, as noted, that counseling terminated after only one session with the child and the parents. We have already described what the record shows about the reasons for the suspension of those services, and we conclude that the record is legally sufficient to support the juvenile court's determination that, under the circumstances, DHS's efforts in involving all of the members of the family in individual and family therapy were reasonable.

We reach the same conclusion with respect to DHS's funding of father's ADHD medication. The record supports a finding that, when DHS learned that father had discontinued his ADHD medication because of its cost, it made reasonable efforts to help him pay for the medication. We also conclude that, under the circumstances, which included the child's disclosure that her visits with father were not going well, DHS's decision concerning the length and number of father's visitations with the child was reasonable. Thus, we reject father's arguments that DHS's efforts were insufficient in each of the respects argued, and we conclude that the record is legally sufficient to support the juvenile court's determination that DHS made reasonable efforts to achieve reunification.

Father argues that the juvenile court erred in determining that he had not made sufficient progress toward reunification, contending that he has ameliorated the safety threats that led to jurisdiction in the first instance, and that DHS's evidence of a lack of progress was insufficient. The caseworker testified at the hearing that DHS had concerns about whether the parents "had internalized what they had learned and being able to move forward." Citing *Dept. of Human Services v. J. M.*, 260 Or App 261, 269, 317 P3d 402 (2013), father asserts that the juvenile court could not properly base its determination on the caseworker's testimony about whether father had "internalized" information. In *J. M.*, we were critical of the state's reliance on psychological reports expressing concern that, despite successful completion of parenting classes, the parent had not "internalized" the social norms against inappropriate corporal punishment. 260 Or App at 268-69. We said that, whether or not a parent

has made "sufficient progress" depends not on what the parent "believes, but what he—at the time of the hearing—is likely to *do*." *Id.* at 268 (emphasis in original). Additionally, father contends that the juvenile court mistakenly based its change in the permanency plan on the child's preferences.

Once again, the juvenile court did not make explicit findings concerning its determination that father had not made sufficient progress, and we assume that the court made findings consistent with its legal conclusion. *J. R. L.*, 256 Or App at 439. There is no indication on this record that the court made its determination based on the evidence that father asserts the court should not have considered. In any event, the record here shows more than a failure to "internalize" therapy and training. Father's counselor stated that father easily falls back into the "victim" role and that he does not express empathy for the children. There is evidence that, despite having completed long-term therapy for domestic violence, father continues to be emotionally abusive of the child during visits and to blame her and her stepsiblings for the family's involvement with DHS. Even if a parent has completed all services that have been required, evidence that a parent continues to engage in behavior that is harmful to a child supports a determination that the parent has not made sufficient progress to make it possible for the child to return home. *Dept. of Human Services v. N. S.*, 246 Or App 341, 351, 265 P3d 792 (2011), *rev den*, 351 Or 586 (2012). We conclude that evidence of father's lack of empathy and his use of visits to intimidate the child and to blame her for the family's separation is legally sufficient to support the juvenile court's determination that father has not made sufficient progress to allow the child to return home safely. ORS 419B.476(2)(a).

Father does not otherwise challenge the change to APPLA. Because we conclude that the juvenile court's "reasonable efforts" and "sufficient progress" determinations are supported by legally sufficient evidence, we conclude that the juvenile court did not err in changing the permanency plan to APPLA.

Affirmed.